IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Ernest Harry Hill, Jr., | ) | C/A No.: 1:11-2322-MBS-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I. Relevant Background

A. Procedural History

On August 20, 2008, Plaintiff filed applications for DIB and SSI under the Social Security Act ("the Act"), 42 U.S.C. §§ 401–433, 1381–1383c. Tr. at 111–24. In his applications, he alleged his disability began on July 1, 1999. Tr. at 111, 118. His

applications were denied initially and upon reconsideration. Tr. at 73–74, 78–79. On July 16, 2010, Plaintiff had a hearing before an Administrative Law Judge ("ALJ"). Tr. at 28–72 (Hr'g Tr.). The ALJ issued an unfavorable decision on January 28, 2011, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 15–27. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on August 31, 2011. [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 39 years old at the time of the hearing. Tr. at 33. He earned his graduate equivalency diploma and attended some college. *Id.* His past relevant work ("PRW") was as a production assembly line worker and cashier. Tr. at 64–65. He alleges he has been unable to work since July 1, 1999. Tr. at 111, 118.

2.    Medical History

Plaintiff began treatment at Anderson-Oconee-Pickens Mental Health Center ("AOP") in August 1999. Tr. at 343, *see* Tr. 352–56. At that time, he was easily distracted and reported a variable mood, decreased sleep and appetite, and a phobia about death, but he was oriented and had normal affect, normal motor activity, normal speech, relevant thought processes, and only slightly impaired recent memory upon examination. Tr. at 354. The AOP counselor diagnosed an adjustment disorder with mixed anxiety and

depressed mood, noting that Plaintiff was distressed and had difficulty adjusting to his marital situation and spiritual faith. *Id.* She assessed a GAF score of 60 and noted that Plaintiff would be assigned to level II care with a therapist and psychiatrist (Dr. Blanton). Tr. at 354, 351.

In September 1999, Plaintiff started taking Paxil for panic attacks. Tr. at 350, 352. In November, his anxiety attacks were improving and he was searching for employment. Tr. at 351. The AOP therapist assigned a GAF score of 65 and noted that Plaintiff wanted to continue counseling with his minister, and use AOP for medications only. *Id.* As of February 2000, Plaintiff had a GAF score of 65, and was receiving counseling through his church and receiving medications from Dr. Blanton. Tr. at 351. He had been referred to vocational rehabilitation and expressed interest in attending group therapy for anxiety. Tr. at 348–49.

By May 2000, Plaintiff was working full-time and had not had a panic attack in several months. Tr. at 349. The AOP therapist assessed a GAF score of 70 and noted that Plaintiff was stable on medications and would start group therapy for anxiety in July. *Id.* By August, he was stable on medications, had attended two group therapy sessions, and had a GAF score of 75. Tr. at 346, 349. He said that his medication helped "considerably," and that he had not had any recent panic attacks. *Id.* The AOP therapist discharged him to level I care. Tr. at 346–47. In November 2000, Plaintiff was seeing a counselor, had panic attacks fewer than once a month, continued to work full-time, and had a GAF score of 75. Tr. at 347.

In February 2001, an AOP therapist noted that Plaintiff described panic attacks of an atypical nature, secondary to faith-based confusion and anxiety related to the hereafter. Tr. at 347. He had stopped going to the counselor at his church due to ineffective communication, but still attended Bible study at his home church. *Id.* He reported only one panic attack in the past six months. *Id.* The therapist assessed a GAF score of 78 and referred Plaintiff for counseling. *Id.*

AOP discharged Plaintiff from care in May 2001 because Plaintiff was working full-time and preferred for his care to be managed by his family doctor (M.K. Jenkins, M.D.). Tr. at 343. Plaintiff's discharge diagnosis was anxiety disorder with agoraphobia. *Id.*

Two years later, in May 2003, Plaintiff returned to AOP because he had lost his job and was looking for less expensive medications. Tr. at 344. He complained of agitation, a change in sleep patterns, anxiety/panic, and hopelessness. Tr. at 344–45. The treatment provider diagnosed a panic disorder not otherwise specified. Tr. at 345.

Plaintiff had several routine visits with Dr. Jenkins from September 2007 to March 2009, for complaints of physical symptoms, including sinus problems, foot pain, and shoulder pain. Tr. at 214–55, 294–307, 312–22. During those visits Plaintiff reported normal activity and energy and no problems with memory, concentration, mood, affect, behavior, sleep patterns, general thought processes, or suicidal ideation. Tr. at 215, 220, 225, 232, 238, 245, 249, 253, 295, 304, 314, 319. Dr. Jenkins noted Plaintiff's history of agoraphobia with panic attacks, but examinations showed that Plaintiff was oriented with

4

normal memory, and appropriate mood and affect. Tr. at 217, 222, 227, 234, 240, 247, 25, 255, 297, 306, 316, 321. During this time, Dr. Jenkins managed Plaintiff's mental health medications, and added a medication for attention deficit disorder ("ADD"). Tr. at 251.

On September 2, 2008, Dr. Jenkins completed a form listing Plaintiff's diagnoses as ADD, agoraphobia, and panic attacks. Tr. at 259. He said Plaintiff was very anxious and had trouble concentrating, and that Plaintiff was oriented with distractible thought processes, obsessive thought content, and poor attention/concentration and memory. *Id.* He felt Plaintiff had "serious" work-related limitations. *Id.*

In September 2008, Plaintiff completed a report about his daily functioning. Tr. at 164–79. He said he assisted his father, who had breathing problems, and cared for a pet cat and tarantula. Tr. at 165. He said he could prepare simple meals and perform household chores, but that he had to be reminded to do just about everything. Tr. at 166. He said he went out once or twice a week, went to restaurants about twice a month, and was able to drive, shop for books, read, watch television, surf the Internet, study, and paint. Tr. at 167–68. He said he could communicate with friends via email and video blogs two to three times a day and that he could pay attention for up to several hours when he took his medication, and could follow simple instructions "fairly well." Tr. at 168–69. Plaintiff also attached an eight-page typed document expanding on his answers in the daily functioning report. Tr. at 172–79. He stated that he took his medication when he remembered to and tried to spread them apart, but that it did not work very well

and many days he took double doses or skipped them altogether. Tr. at 172. He stated he enjoyed eating in restaurants and did so three or four times a month. *Id.* He reported that new places and new people scared him to death. *Id.* He noted that he could handle impersonal, one-sided conversations on the telephone, but not back-and-forth conversations. Tr. at 173. He described feeling rage toward people who offend or attack him and fantasizing about humiliating, torturing, or killing them. *Id.*

On November 4, 2008, Plaintiff saw James Phillips, III, Ph.D., for a mental status evaluation. Tr. at 260–63. Dr. Phillips summarized Plaintiff's mental health records and noted he had not been hospitalized for mental health reasons. Tr. at 260–61. Plaintiff said his mental difficulties onset suddenly in 1999 or 2000. Tr. at 260. He said he seldom left his parent's house where he lived, and that he was reasonably comfortable with minimal panic attacks if he stayed there. Tr. at 260–61. Dr. Philips noted Plaintiff could "work on the computer, communicate with others indirectly via the computer, can call and order food, etc[.,] though he has difficulty answering the phone if it is going to be an exchange conversation." Tr. at 260. Plaintiff said he had some good days where he could get out and maybe see some friends, but that these days were infrequent and unpredictable. *Id.* On examination, Plaintiff was oriented (except for the date, but he knew it was Election Day) and he had intact fund of information and abstraction capacity and the ability to do serial sevens, recall six digits forward and five backwards, recall three items on immediate recall, and retain two of three items after a five-minute delay. Tr. at 262. Dr. Phillips diagnosed an anxiety disorder, not otherwise specified, with generalized and

phobic features, and an adjustment disorder with depressed mood and consequently varying level of depression, not otherwise specified. *Id.* Dr. Phillips felt Plaintiff was capable of funds management, learning, and retaining instructions, but was extremely limited in his capacity to tolerate others and would not be able to reliably do so in a work situation. *Id.* He further opined that when Plaintiff's anxiety was exacerbated, his attention and concentration would become markedly impaired. *Id.* He concluded that Plaintiff "would not be reliable in terms of his capacity to carry out work duties over time." Tr. at 263.

In a Psychiatric Review Technique ("PRT") dated November 19, 2008, state agency physician Robbie Ronan, Ph.D., noted Plaintiff to have attention deficit hyperactivity disorder ("ADHD"), non-specific depression, panic with agoraphobia, and anxiety. Tr. at 271–76. The doctor opined that Plaintiff was moderately limited in activities of daily living ("ADLs"), in maintaining social functioning, and in maintaining concentration, persistence, and pace. Tr. at 281. He found that although Plaintiff's impairments are severe, they would not preclude him from performing simple, repetitive, routine tasks or interacting appropriately with co-workers or supervisors. Tr. at 283. He noted that Plaintiff appears capable of interacting appropriately with others when motivated to do so and found that Plaintiff's psychological evaluation (completed by Dr. Phillips) was not supported by his work history or functioning. *Id.* In a corresponding Mental Residual Functional Capacity ("RFC") Assessment, Dr. Ronin found Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed

instructions; to interact appropriately with the general public; and to set realistic goals or make plans independently of others. Tr. at 285–86.

On January 15, 2009, William Dowling, M.A., completed a psychological review report form for a vocational rehabilitation program. Tr. at 342. He identified Plaintiff's functional limitations including lack of motivation leading to lower productivity, irritability leading to conflict with co-workers and/or supervisors, poor concentration/distractibility could lead to mistakes and accidents on the job, and short-term memory impairment leading to inability to follow instructions and complete tasks. *Id.* He recommended mental health treatment, counseling, stress management classes, and medication management. *Id.*

On May 11, 2009, state agency psychologist Xanthia Harkness, Ph.D., completed a second PRT finding the same moderate limitations opined by Dr. Ronin. Tr. at 333. Dr. Harkness concluded that Plaintiff had the ability to perform simple, unskilled work. Tr. at 335. She also completed a Mental RFC Assessment. In addition to the moderate limitations identified by Dr. Ronin, Dr. Harkness opined that Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods; to accept instructions and respond appropriately to criticism from supervisors; and to travel in unfamiliar places or use public transportation. Tr. at 337–38.

On June 28, 2010, Dr. Jenkins completed a form at the request of Plaintiff's representative. Tr. at 341. Dr. Jenkins listed Plaintiff's diagnoses as obesity, depression, anxiety, agoraphobia with panic attacks, and ADD. *Id.* He said Plaintiff had trouble

speaking to most people, had panic attacks any time he left home, and had difficulty coming to his office for appointments. *Id.* Dr. Jenkins concluded, "I do not feel [Plaintiff] can work. He could not handle even minor stress, and would have panic attacks dealing with coworkers and the public. He would have multiple absences and likely need multiple breaks in an eight hour shift." *Id.*

On October 25, 2010, Plaintiff saw Brian Keith, Ph.D., for a psychological evaluation. Tr. at 365–69. Plaintiff said he had constant thoughts of dying, low energy, difficulty sleeping, and a constantly depressed mood, and that he had started attending mental health therapy online, rather than in-person. Tr. at 365. Plaintiff said he read, watched television, studied, cared for his personal needs, drove to a restaurant twice a month, prepared meals, and went to the bank (through the drive-thru). *Id.* Dr. Keith noted that Plaintiff also used a computer, painted a little, and could manage checking and savings accounts, although his parents paid his bills. *Id.* On examination, Plaintiff had a restricted affect, but was alert, oriented, and attentive with appropriate speech; a demeanor that was on task, but sometimes teary; coherent and linear conversation; and no suicidal ideation. Tr. at 366–67. Testing by Dr. Keith revealed that Plaintiff had average working memory and intellect, "quite good" cognitive skills, and was not malingering. Tr. at 368–69. Dr. Keith diagnosed possible generalized anxiety disorder and obsessive compulsive disorder ("OCD"). Tr. at 368. He opined that Plaintiff may have some difficulty with concentration and maintaining a satisfactory job pace, but that his cognitive skills appeared sufficient for completing moderately to complex tasks, three to

four-step activities, and following moderately detailed instructions.  Tr. at 368–69.  Dr. Keith noted that Plaintiff worked for two years on a job before quitting, stating that he does not get along with people.  Tr. at 369.  He also noted that given Plaintiff's statement that he does not get along with people, he may have difficulty interacting with his work peers.  *Id.*  Dr. Keith stated that perhaps with ongoing therapeutic intervention, Plaintiff could find himself coping effectively with his issues relative to anxiety and OCD.  *Id.*

In an undated Disability Report, Plaintiff reported that he last worked on May 15, 2008.  Tr. at 143.  He stated that he only worked because he thought his disabled dad was going to lose his health insurance, but he quit when his mom was able to pay for the health insurance because he "could not do the job anymore."  *Id.*  He further stated that mentally [he] should not have been working at all."  *Id.*

C.      The Administrative Proceedings

1.      The Administrative Hearing

a.      Plaintiff's Testimony

At the July 16, 2010 hearing, Plaintiff testified that he lived with his parents at his father's house.  Tr. at 32.  Plaintiff testified that he last worked, on an assembly line, from March 2007 until he quit that in May 2008 due to plantar fasciitis and stress.  Tr. at 33–34, 41–42.  He said he previously worked for about a year and half, in 2004 or 2005, as a furniture assembler for his cousin.  Tr. at 34–35.  He said he quit that job because his cousin was taking advantage of him by paying him less than minimum wage.  Tr. at 35,

46.  He said he also worked as a clerk at a convenience store during various times from 1998 to 2003.  Tr. at 44–46.

Regarding his impairments, Plaintiff said he was already having some of his problems with anxiety and irrational thoughts when he worked for his cousin.  Tr. at 35.  He said he was scared of people he did not know and was scared of being in the hearing room.  Tr. at 35–36.  He explained that he had "a little bit of anxiety" his whole life, but "there was a specific moment actually in about '98 or '99," when he was working and had a "vision of [him]self dead, and like a neolithic like the void . . . it just freaked me out to the point that I literally had to turn my machine off and go to the bathroom and start crying."  Tr. at 36.  He said he continued to have similar episodes, and that the last such episode was a couple of months ago.  Tr. at 36–37.  He said his medications helped, but that he had to "stay focused" and "constantly work [his] mind on distractive things" to avoid the episodes.  Tr. at 37.  He said he had a panic attack with Dr. Phillips because he was nervous around new people.  Tr. at 37–38.  He said he did not have attacks like that very often because he left his house only three or four times a month.  Tr. at 38.  He said the only treatment he was receiving for his anxiety was medication.  *Id.*  He said his utopian job would be to have an art studio with no one else around.  Tr. at 38–39.

Plaintiff reported weighing 300 pounds at the hearing and said that his weight fluctuated between 230 and 330 pounds.  Tr. at 39–40.  He stated he felt his weight limited him because he was ugly and felt like he would never find someone with whom to settle down.  Tr. at 40.

Plaintiff said he could drive and did so four or five times a month. Tr. at 40. He said he went to vocational rehabilitation in 2008, but had not made any attempts to work since leaving his last job. Tr. at 42. He said he sometimes forgot to take his medications and that his medications caused "[f]uzzy headiness" and dizziness. Tr. at 53, 55. He said he had difficulty sleeping. Tr. at 46–47.

As to his daily activities, he said he watched television, played video games, read a lot (science fiction and Russian literature, including Tolstoy and Dostoevsky), cared for a cat, a pet spider, prepared simple meals, took out the trash, and occasionally shopped for books. Tr. at 48–50. He said he enjoyed working in the yard (weeding, cutting grass, and caring for his small vegetable garden). Tr. at 47. He said he associated with people online, but did not have friends that he visited and did not go to church. Tr. at 47, 49. He said he did not talk on the telephone because it "completely freak[ed] [him] out." Tr. at 51. He said he would be able to ride a motorcycle or go four-wheeling, but did not have land or a motorcycle. Tr. at 51. He stated he had heel spurs and plantar fasciitis that prevented him from being able to mow the front and backyard on the same day. Tr. at 52. He also claimed to have bursitis in his right shoulder that caused him pain if he twisted it a certain way. *Id.*

### b. Plaintiff's Mother's Testimony

Plaintiff's mother testified that he began having emotional problems three and a half or four years earlier. Tr. at 57. She said Plaintiff used to be outgoing, caring, and compassionate, but became scared to leave the house. Tr. at 57, 59. She said he took his

medication on his own.  Tr. at 58.  She said he had a panic attack at least once a week and that his last panic attack was a week and a half prior to the hearing.  Tr. at 59, 61.  She said he could care for his personal hygiene and handle money, had online friends, and helped care for his father, who had emphysema, but would not talk on or answer the phone.  Tr. at 59, 60, 62–63.

c. Vocational Expert Testimony

Vocational Expert ("VE") George Mark Leaphart reviewed the record and testified at the hearing.  Tr. at 64–69.  The VE categorized Plaintiff's PRW as a production assembly line work as light, unskilled work and as a cashier as light, unskilled work.  Tr. at 64–65.  The ALJ described a hypothetical individual of Plaintiff's vocational profile who was not limited physically in any way, but was limited as set forth in the Mental RFC Assessments (Tr. at 285–88, 337–30); could concentrate, persist, and work at pace to do simple, routine, repetitive tasks for about two hours blocks of time over an eight-hour day; could only occasionally interact with the public; could interact appropriately with co-workers and supervisors in a routine, stable setting that would be non-stressful, non-production, quota-type work.  Tr. at 66.  The VE testified that the hypothetical individual could not perform Plaintiff's PRW.  *Id.*  The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical person could perform.  *Id.*  The VE identified the following unskilled jobs: paper cone machine tender (DOT 641.685-062), light work (2,170 jobs in South Carolina; 85,000 nationally); sealling machine tender (DOT 641.685-074), light work (530 jobs in South Carolina;

19,000 nationally); and automatic machine attendant (DOT 649.685-020), medium work (3,160 jobs in South Carolina; 280,000 nationally). Tr. at 66–67. The VE also identified the following sedentary, unskilled jobs: weaver defect clerk (DOT 221.587-042) (3,500 jobs in South Carolina; 160,000 nationally); surveillance systems monitor (DOT 379.367-010) (800 jobs in South Carolina; 8,000 nationally); and carting machine operator (DOT 681.685-030) (3,700 jobs in South Carolina; 36,000 nationally). Tr. at 67. The VE stated that none of the jobs would require interaction with the public except surveillance systems monitor, which may require using the telephone to alert security if there was a problem. Tr. at 68. The VE further stated that if the hypothetical individual could not concentrate, persist, or work at pace eight hours a day, he would not be able to work in the national economy. Tr. at 69. The VE stated that his testimony was consistent with the *Dictionary of Occupational Titles*. *Id.*

2.    The ALJ's Findings

In his January 28, 2011 decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.
2.    The claimant engaged in substantial gainful activity during the following periods: continuously until May 2008 (20 CFR 1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).
3.    However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period the claimant did not engage in substantial gainful activity.

4. The claimant has the following severe combination of impairments: obesity; generalized anxiety disorder; obsessive compulsive disorder; and personality disorder (20 CFR 404.1520(c) and 416.920(c)).

5. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except I specifically find that the claimant can lift or carry up to 10 pounds occasionally and 5 pounds frequently. He can sit for up to 6 hours and stand/walk for up to 2 hours in an 8-hour workday. He can concentrate, persist, and work at pace to do simple, routine, repetitive tasks for 2-hour periods during an 8-hour workday. He can perform occasional interaction with the public, but he could interact appropriately with coworkers and supervisors in a routine, stable setting that is non-production/quota work.

7. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8. The claimant was born on April 8, 1971 and was 28 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, 416.969(a)).

12. The claimant has not been under a disability, as defined in the Social Security Act, from July 1, 1999, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 17–27.

D. Evidence Submitted to the Appeals Council

On May 3, 2011, Plaintiff's on-line counselor, Jane Price, LPC, LLC, sent a letter

to his representative stating that Plaintiff is not able to handle even minor stresses; cannot

interact with the public; and is incapable of obtaining and maintaining employment because of the multiple diagnoses that keep him from getting effective treatment for OCD.  Tr. at 371–72.

II.     Discussion

Plaintiff alleges the ALJ's decision is not supported by substantial evidence because he did not accord proper weight to Plaintiff's treating physician and examining and non-examining consultants.    The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability

claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents him from doing substantial gainful employment.  *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary.  20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity.  20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

work.  *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982).  The claimant bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW.  *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002).  If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work.  *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

Plaintiff contends the ALJ's decision was not supported by substantial evidence. [Entry #15 at 9].  In support, he argues that the ALJ did not properly evaluate the opinions of Drs. Jenkins, Phillips, and Keith and Mr. Dowling. *Id.* at 10–11.  The Commissioner contends the ALJ reasonably weighed those opinions.  [Entry #16 at 13–19].

1.     Dr. Jenkins's Opinion

Plaintiff argues the opinion of his treating physician, Dr. Jenkins, was entitled to great weight and was wrongly rejected by the ALJ because there was no evidence contradicting Plaintiff's disability in the record.  [Entry #15 at 10].    If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]"  SSR 96-2p; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(d)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence).    The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.    *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(d)(2).    However, "the rule does not require that the testimony be given controlling weight."  *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether

the physician is a specialist." *Johnson*, 434 F.3d at 654. The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d, 171, 176 (4th Cir. 2001). In undertaking review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

On September 2, 2008, Dr. Jenkins completed a form stating that Plaintiff was very anxious, had trouble concentrating, and was oriented with distractible thought processes, obsessive thought content, and poor attention/concentration and memory. Tr. at 259. He felt Plaintiff had "serious" work-related limitations. *Id.* On June 28, 2010, Dr. Jenkins completed a form at the request of Plaintiff's representative. Tr. at 341. Dr. Jenkins noted that Plaintiff had trouble speaking to most people, had panic attacks any time he left home and had difficulty coming to the doctor's office for appointments. *Id.* Dr. Jenkins concluded, "I do not feel [Plaintiff] can work. He could not handle even minor stress, and would have panic attacks dealing with coworkers and the public. He would have multiple absences and likely need multiple breaks in an eight hour shift." *Id.*

Opinions that a claimant is disabled or unable to work are reserved to the Commissioner and are not considered medical opinions. 20 C.F.R. §§ 404.1527(d), 416.927(d). Pursuant to the regulations, the Commissioner will not give any special significance to the source of an opinion on an issue reserved to the Commissioner. *Id.*

21

Thus, Dr. Jenkins's opinion that Plaintiff is unable to work is not entitled to any special significance.

As to the remainder of Dr. Jenkins's opinions, the ALJ properly explained his reasoning for discounting them. After setting forth a summary of the opinions, the ALJ accorded them little weight because he found they were "quite inconsistent with the longitudinal history of treatment [Dr. Jenkins] has provided." Tr. at 23. The ALJ noted that throughout Dr. Jenkins's treatment of Plaintiff there were many instances where the doctor never even diagnosed Plaintiff with a mental disorder. *Id.* Furthermore, even at the times Plaintiff was diagnosed with a mental disorder, "the records show the claimant reporting no abnormality and the psychiatric examination by Dr. Jenkins also revealed no problems." *Id.* Finally, the ALJ found that while Dr. Jenkins stated in June 2010 that Plaintiff experiences depression and anxiety, he never once diagnosed Plaintiff with either disorder throughout the course of his treatment. *Id.*

By reviewing Dr. Jenkins's opinions regarding Plaintiff's condition and considering them in light of Plaintiff's treatment and other medical records, the ALJ did what he was required to do. He considered Dr. Jenkins's opinions and found that they were inconsistent with his own treatment records. *See Craig*, 76 F.3d at 590. The undersigned's review of the record confirms that Dr. Jenkins's treatment records document Plaintiff's numerous reports of normal activity and energy and no problems with memory, concentration, mood, affect, behavior, sleep patterns, general thought processes, or suicidal ideation. Tr. at 215, 220, 225, 232, 238, 245, 249, 253, 295, 304,

314, 319. Dr. Jenkins also repeatedly found that Plaintiff was oriented with normal memory, and appropriate mood and affect. Tr. at 217, 222, 227, 234, 240, 247, 25, 255, 297, 306, 316, 321. Consequently, the undersigned finds that the ALJ's decision to discount Dr. Jenkins's opinions is supported by substantial evidence.

2. Dr. Phillips's Opinion

Plaintiff next contends the ALJ erred by discounting the opinion of Dr. Phillips, who performed a psychological consultative examination ("CE") of Plaintiff on November 4, 2008. [Entry #15 at 10]. The Commissioner argues the ALJ gave legally-valid reasons for discounting Dr. Phillips's opinion. [Entry #16 at 15].

Based on his review of the medical records and his single, in-person evaluation of Plaintiff, Dr. Phillips diagnosed Plaintiff with a non-specific anxiety disorder with generalized and phobic features and a non-specific adjustment disorder with depressed mood and varying levels of depression. Tr. at 262. Dr. Phillips opined Plaintiff was capable of funds management, learning, and retaining instructions, but was extremely limited in his capacity to tolerate others and would not be able to reliably do so in a work situation. *Id.* He further opined that when Plaintiff's anxiety was exacerbated, his attention and concentration would become markedly impaired. *Id.* Dr. Phillips concluded that Plaintiff "would not be reliable in terms of his capacity to carry out work duties over time." Tr. at 263.

The ALJ accorded little weight to Dr. Phillips's opinion finding that the doctor's "own CE states that the claimant could work on a computer, communicate with others

indirectly via the computer, and could call and order food." Tr. at 23–24. The ALJ noted that he did not take this as a statement of the jobs Plaintiff could perform, but did believe these statements showed Plaintiff is not completely disabled by his mental impairments. Tr. at 24. The ALJ further found that Dr. Phillips's notation that Plaintiff worked for quite a few years before his sudden onset in 1999–2000 was only half true because Plaintiff's records show he worked before, at the time of, and for many years after his alleged sudden onset date in 1999. *Id.*

Plaintiff's two-sentence argument is that the ALJ's decision to accord little weight to Dr. Phillips'ss opinion "because the claimant could work on a computer" was flawed in that the ALJ's decision "clearly is not based on the whole report of Dr. Phillips which is clearly in accord with the report of claimant's physician Dr. Jenkins." [Entry #15 at 10]. This argument ignores the ALJ's findings regarding the other ADLs noted in Dr. Phillips's report that undercut Plaintiff's claim of complete disability. It further ignores the ALJ's conclusion that Dr. Phillips was apparently lacking crucial information regarding Plaintiff's work history when he opined on Plaintiff's functional limitations.

The ALJ's discussion of Dr. Phillips's opinions demonstrates that he considered the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c). He noted Dr. Phillips performed a psychological CE of Plaintiff, thus he considered whether Dr. Phillips had examined Plaintiff and the nature of the treatment relationship. Tr. at 22. In finding Dr. Phillips's opinions to be inconsistent with his own description of Plaintiff's ADLs, the ALJ considered the supportability of the opinion and the consistency of the opinion with

the record. Tr. at 24. As an "other factor," the ALJ also considered that Dr. Phillips was basing his opinions on incomplete information regarding Plaintiff's work history. *Id.* For these reasons, the undersigned concludes the ALJ's decision to accord little weight to the opinion of Dr. Phillips is supported by substantial evidence.

### 3. Dr. Keith's Opinion

Plaintiff also underwent a psychological CE by Dr. Keith in October 2010. Tr. at 365–69. The ALJ gave great weight to Dr. Keith's opinion. Tr. at 24. He noted that Dr. Keith concluded that due to Plaintiff's thought content, he may have some difficulty with concentration and maintaining a satisfactory job pace, and he may have trouble interacting with his work peers. Tr. at 25. The ALJ further noted that Dr. Keith found no impairment in Plaintiff's ability to understand, remember, and carry out instructions because he has average cognitive ability. *Id.* Based on Plaintiff's anxiety and obsessive compulsive disorder, Dr. Keith found mild limitations in Plaintiff's ability to interact appropriately with co-workers and supervisors and moderate limitations responding appropriately to usual work situations and changes in routine work setting. *Id.*

Plaintiff contends that despite the ALJ's statement that he gave great weight to Dr. Keith's opinion, the ALJ disregarded Dr. Keith's opinion that "the claimant may have some difficulty with concentration and maintaining a satisfactory job pace and he may have difficulty relating with his work peers." [Entry #15 at 11]. Rather than arguing how and why this opinion should impact his RFC, Plaintiff simply states "[t]his is hardly a ringing endorsement of the claimant's ability to work." *Id.*

Contrary to Plaintiff's assertion, the ALJ specifically referenced Dr. Keith's opinion as to Plaintiff's concentration, job pace, and ability to relate to his work peers. Tr. at 25. Furthermore, the ALJ incorporated these limitations into his RFC determination by limiting Plaintiff to a routine, stable work setting with non-production/quota work and finding that Plaintiff could only concentrate, persist, and work at pace doing simple, routine, repetitive tasks for two-hour periods during an eight-hour workday. Tr. at 20. Because the ALJ adequately considered Dr. Keith's opinion, gave it controlling weight, and incorporated it into his RFC determination, the undersigned finds Plaintiff's argument to be without merit.

### 4. Mr. Dowling's Opinion

In addition to the foregoing three treating and examining physicians, Plaintiff was evaluated by Mr. Dowling, a psychologist at the South Carolina Vocational Rehabilitation Department. Tr. at 342. Mr. Dowling listed the following functional limitations for Plaintiff: lack of motivation leading to lower productivity on the job; fluctuations in mood/irritability leading to conflict with co-workers and/or supervisors; poor self-esteem/insecurity leading to impaired interpersonal relationship skills on the job; short-term memory impairment leading to an inability to follow instructions in completing work tasks; somatic complaints and fatigue leading to increased absenteeism and decreased productivity; poor concentration/distractibility which could lead to mistakes and accidents while on the job; and forgetfulness in completing work

assignments.  *Id.*  Mr. Dowling also noted that failing to plan ahead could affect the prompt completion of work tasks.  *Id.*

The ALJ found that Mr. Dowling was not an acceptable medical source worthy of deference.  Tr. at 24.  Plaintiff has not challenged that finding on appeal.  Instead, Plaintiff contends the ALJ erroneously dismissed the opinion of Mr. Dowling, a counselor, on the grounds that Mr. Dowling did not personally examine Plaintiff.  [Entry #15 at 10].  Plaintiff argues this finding conflicts with the ALJ's decision to give great weight to the non-examining DSS consultants Drs. Ronin and Harkness.  *Id.* at 11.  The Commissioner argues the ALJ properly discounted the opinion of Mr. Dowling, who was not an acceptable medical source.  [Entry #16 at 17–18].

The Social Security Regulations distinguish between opinions from "acceptable medical sources" and "other sources."  *See* 20 C.F.R. §§ 404.1513(d), 416.913(d).  Social Security Ruling 06–03p further discusses "other sources" as including both "medical sources who are not acceptable medical sources" and "non-medical sources."  Only acceptable medical sources can establish the existence of a medically-determinable impairment, give medical opinions, and be considered treating sources whose opinions may be entitled to controlling weight.  SSR 06–03p.  However, medical sources who are not acceptable medical sources may provide opinions reflecting "the source's judgment about some of the same issues addressed in medical opinions from 'acceptable medical sources,' including symptoms, diagnosis and prognosis, and what the individual can still

do despite the impairment(s), and physical or mental restrictions." SSR 06–03p.  Social Security Ruling 06–03p further provides:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.  In addition, when an adjudicator determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the notice of decision . . . .

*Id.*

Finally, the ALJs are instructed to apply the factors for evaluating the opinions of acceptable medical sources, which are listed in 20 C.F.R. §§ 404.1527(c) and 416.927(c), in evaluating the opinions from other sources with the understanding that not every factor may apply.  *Id.*  These factors include: (1) whether the physician has examined the claimant, (2) the treatment relationship between the physician and the claimant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, (5) whether the physician is a specialist, and (6) other factors that may support or contradict the opinion.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).  Because Mr. Dowling is not an acceptable medical source, he may not establish the existence of a medically-determinable impairment and the ALJ was obligated to analyze Mr. Dowling's opinion as set forth above.

Plaintiff argues the ALJ erred in evaluating Mr. Dowling's opinion. A review of the ALJ's decision, however, reveals the ALJ explained the weight given to Mr. Dowling's opinion as he "generally should," but is not required to do. SSR 06–03p. In considering Mr. Dowling's opinion, the ALJ gave it little weight "in part because it does not appear that he has ever met with or examined the claimant personally." Tr. at 24. As is stated above, the ALJ also found that Mr. Dowling was not an acceptable medical source worthy of deference in this situation. *Id.* In accordance with SSR 06–03p, the ALJ's analysis addressed some of the factors used to evaluate medical source opinions including whether the provider had examined Plaintiff and the nature of the treatment relationship. Because of the ALJ's prior findings with regard to the opinions of Drs. Jenkins and Phillips, it is also apparent that the ALJ called into question the supportability of Mr. Dowling's opinions and the consistency of those opinions with the record.

The undersigned is not persuaded by Plaintiff's argument that the ALJ's finding with regard to Mr. Dowling's opinion is in conflict with him according great weight to the opinions of the state agency examiners. [Entry #15 at 11]. Unlike Mr. Dowling, "[s]tate agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p. Furthermore, the regulations require the ALJ to evaluate their opinions in making his decision. *See* 20 C.F.R. 404.1527(e)(2)(i), 416.927(e)(2)(i).

Because the ALJ evaluated Mr. Dowling's opinion in accordance with the regulations and offered sound reasons for discounting the opinion, the undersigned finds the ALJ's decision to give little weight to the opinion was supported by substantial evidence.

For the foregoing reasons, the undersigned recommends finding that the ALJ properly weighed the opinion evidence of the medical and non-medical sources and that his decision was supported by substantial evidence.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether his decision is supported as a matter of fact and law.  Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

Shiva V. Hodges

September 28, 2012                              Shiva V. Hodges
Columbia, South Carolina                    United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).